# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

ASSOCIATION OF AMERICAN                )
RAILROADS,                             )
                                       )
     Plaintiff,                        )
                                       )
     v.                                )     Case No. 1:11-CV-1499 (JEB)
                                       )
DEPARTMENT OF TRANSPORTATION, )
RAY LAHOOD, Secretary of               )
Transportation, FEDERAL RAILROAD       )
ADMINISTRATION, JOSEPH C. SZABO, )
Administrator, Federal Railroad        )
Administration,                        )
                                       )
     Defendants.                       )
_____)


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     Defendants hereby move for summary judgment under Federal Rule of Civil

Procedure 56.  The bases for this motion are explained in the accompanying

memorandum.


Dated:  February 3, 2012               Respectfully submitted,

                                         TONY WEST
                                         Assistant Attorney General

                                         RONALD C. MACHEN JR
                                         United States Attorney

                                         SANDRA M. SCHRAIBMAN
                                         (D.C. Bar No. 188599)
                                         Assistant Branch Director, Federal
                                         Programs Branch, Civil Division

    /s/ Justin M. Sandberg
JUSTIN M. SANDBERG
(Ill. Bar No. 6278377)
Trial Attorney
U.S. Dept. of Justice, Civil Division,
Federal Programs Branch
20 Mass. Ave., NW, Rm. 7302
Washington, DC 20001
(202) 514-5838 phone
(202) 616-8202 fax
justin.sandberg@usdoj.gov

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
ASSOCIATION OF AMERICAN             )
RAILROADS,                          )
                                    )
    Plaintiff,               )
                                    )
    v.                       )    Case No. 1:11-CV-1499 (JEB)
                                    )
DEPARTMENT OF TRANSPORTATION, )
RAY LAHOOD, Secretary of            )
Transportation, FEDERAL RAILROAD    )
ADMINISTRATION, JOSEPH C. SZABO, )
Administrator, Federal Railroad     )
Administration,                     )
                                    )
    Defendants.              )
_____)

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT**

**INTRODUCTION**

Plaintiff – an association that includes the major freight railroads of North

America – challenges a provision of the Passenger Rail Investment and Improvement Act

of 2008.  In that Act, Congress tasked the Federal Railroad Administration (FRA) and the

National Railroad Passenger Corporation (Amtrak) with jointly developing metrics and

minimum standards, known as the Metrics and Standards, for measuring the performance

and service quality of Amtrak trains.  Amtrak and the freight railroads share tracks

throughout much of the country, and the Metrics and Standards provide measures by

which to assess delays of Amtrak trains attributable to the freight railroads.  Plaintiff

fears that poor performance by its member freight railroads under these Metrics and

Standards could lead to fines being imposed by the Surface Transportation Board (STB). To obviate this perceived problem, Plaintiff argues that Amtrak is a private entity and so cannot exercise governmental power under the non-delegation and separation-of-powers principles of the Constitution.  Plaintiff also contends that Amtrak's involvement in developing the Metrics and Standards violates the Due Process Clause:  It asserts that Amtrak cannot exercise governmental authority because it is a private entity that has a financial interest in the content of the Metrics and Standards, owing to a statutory provision which permits Amtrak to receive certain fines levied by the STB.

Even if Amtrak is a private entity for purposes of Plaintiff's claims, Plaintiff's claims fall short.  A private entity can exercise governmental authority if the Government retains control.  It did here.  The degree of governmental control is evident from the make-up of Amtrak:  the President of the United States appoints eight of nine Amtrak board members (the board appoints the ninth); the President can remove board members; and, Congress provides Amtrak with essential capital, including around $1.5 billion for fiscal year 2011, and has stayed closely involved in the operation of Amtrak.  What is more, the Metrics and Standards were developed jointly by FRA and Amtrak and were issued only because the FRA assented.   Finally, contrary to Plaintiff's contentions, the Metrics and Standards cannot serve as the basis for any fines.  A freight railroad can be fined by the STB, a governmental agency, only for violating a separate, long-standing, and unchallenged statutory provision which provides that, with limited exceptions, Amtrak trains have a preference over freight transportation in using a rail line, junction, or crossing.  With respect to fine, the Metrics and Standards merely guide the STB's

decision of whether to initiate an investigation under that other provision.   Thus, with respect to assessing fines, the Government remains in charge.

Though the Court need not determine whether Amtrak is part of the Government for purposes of Plaintiff's claims to decide this case, in fact, Amtrak is part of the Government for these purposes.   Determining whether Amtrak is an agency or instrumentality of the Government is not uncharted territory.   The Supreme Court concluded in 1995 that Amtrak is part of the Government "for the purpose of individual rights guaranteed against the Government by the Constitution," because the Government created (by statute) and controlled (by appointing the majority of its board of directors) Amtrak.   *Lebron v. Nat'l R.R. Pass. Corp.*, 513 U.S. 374, 393-94 (1995).   It is still true today that, as judged under the *Lebron* standard, the Government created and controls Amtrak.   And Plaintiff's due process claim asserts an individual right.   *Lebron*, thus, dictates the fate of that claim.   Plaintiff's other claims deserve like treatment.   Plaintiff offers no principled reason for treating Amtrak differently based on the label it affixes to its claim, and no reason is apparent:  The claims are essentially the same and Amtrak's nature does not change based on the label Plaintiff chooses.

Finally, Amtrak's role in the development of the Metrics and Standards passes the applicable Due Process Clause requirements.   Specifically, Amtrak does not have an impermissible pecuniary interest in the Metrics and Standards.   The involvement of the STB, the agency that investigates and adjudicates any complaint arising from the Metrics and Standards, and which Plaintiff does not claim harbors any bias, dictates that a relaxed due process standard applies – as does the fact that Amtrak participated in a non-adjudicatory, legislative-type process.   Amtrak's role in the creation of the Metrics and

Standards easily passes muster under this relaxed standard because:  (1) the FRA, which Plaintiff does not allege to be biased, co-authored the Metrics and Standards, and its involvement would have decreased Amtrak's desire to act in a biased fashion; (2) as Amtrak is politically accountable and the freight railroads have ample political muscle, Amtrak would not have an interest in acting in a biased manner; and (3) Amtrak's interest in biased Metrics and Standards is weak because of the many contingencies that stand between the Metrics and Standards and Amtrak's pecuniary interests.

For these reasons, as more fully elaborated below, the Court should enter judgment in favor of Defendants and deny Plaintiff's motion for summary judgment.[1]

## BACKGROUND

I.      Historical, Statutory, and Regulatory Background

Congress created Amtrak in 1970 to "avert the threatened extinction of passenger trains in the United States."  *Lebron*, 513 U.S. at 383.  In the 1950s and 1960s, railroads lost passengers (and freight) to other modes of transportation.  Congressional Budget Office, *The Past and Future of U.S. Passenger Rail Service*, at 5-7 (Sept. 2003) (attached as Exhibit 1).  This competition, combined with "rigid regulation" by the Interstate Commerce Commission (ICC), inflicted punishing losses on the railroads.  *Id.* at 5.  The railroads viewed passenger service as their primary Achilles heel.  *Id.* at 7.  But they could not eliminate passenger service of their own accord; prior to 1970, the law obligated railroads, as common carriers, to provide passenger service, unless relieved of the obligation by the ICC or state regulatory authorities.  *Nat'l R.R. Pass. Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 454 (1985).  Accordingly, to avert

---

[1] Summary judgment is warranted because defendants are entitled to judgment on the law and there are no genuine disputes of material fact.  *See* Fed. R. Civ. P. 56(a).

financial ruin, many of the railroads asked the ICC to relieve them of their obligation to provide passenger service.  *Id.*  Congress, however, determined that "the public convenience and necessity require the continuance and improvement" of passenger rail service.  Rail Passenger Service Act of 1970 (RPSA), § 101, 84 Stat. 1327.  Thus, Congress established Amtrak as the successor of those railroads that wished to abandon passenger rail service.   RPSA, § 401(a) (codified at 45 U.S.C. §§ 561-566) (repealed and incorporated in sections of 49 U.S.C. subtit. V, part C).

        As a condition of turning over passenger rail service to Amtrak, Congress obligated the freight railroads to lease their tracks and facilities to Amtrak, at rates agreed to by Amtrak and the host freight railroads (or prescribed by the STB).  *See* 49 U.S.C. § 24308(a).   This measure was necessary because the freight railroads owned and dispatched the trains on the tracks that Amtrak would need to provide service. (Outside of the Northeast Corridor – where Amtrak owns the tracks over which its trains operate – Amtrak continues to lease the majority of track miles used by its trains.)  And to ensure the "improvement" of passenger rail service for the public good, Congress granted Amtrak a general preference over freight transportation with regard to the tracks that its trains would have to share with freight trains:  "Except in an emergency, intercity and commuter rail passenger transportation provided by or for Amtrak has preference over freight transportation in using a rail line, junction, or crossing unless the [Surface Transportation] Board orders otherwise under this subsection."  *Id.* § 24308(c).  This preference requirement is essential to achieving timely Amtrak train performance because without it the host freight railroad would prioritize its own freight traffic over Amtrak's trains.

Amtrak's corporate structure and goals reflect the public nature of its duty, as recognized in § 101 of the RPSA.  First, Amtrak's board of directors consists of nine members, eight of whom are selected by the President of the United States, and one of whom is selected by the President's other appointees.  49 U.S.C. § 24302.  The President appoints seven members, with the advice and consent of the Senate; the eighth member is the Secretary of Transportation, who serves *ex officio*; and, the ninth member is the President of Amtrak, who is selected by the other members of the board.  *Id.*  Second, the Government owns more than 90% of Amtrak's stock.  To be specific, the Government owns 109,396,994 shares of the 118,782,688 outstanding shares of stock.  Nat'l R.R. Pass. Corp and Sub., Consolidated Financial Statements for the Years Ended Sept. 30, 2011 and 2010 (Consolidated Financial Statements), at 17-18 (Dec. 2011) (attached as Exhibit 2).  Third, Amtrak depends on substantial, annual federal appropriations to operate in its current form:  "The Company has a history of recurring operating losses and is dependent on subsidies from the Federal Government to operate the national passenger rail system and maintain the underlying infrastructure.  These subsidies are usually received through annual appropriations."  *Id.* at 6.  Finally, the public nature of Amtrak's duty is revealed by the public interest goals that Congress has articulated for Amtrak, such as the goal of "provid[ing] additional or complementary intercity transportation service to ensure mobility in times of national disaster or other instances where other travel options are not adequately available."  49 U.S.C. § 24101(c)(9).

Notably, Congress has not stayed its hand since creating Amtrak.  Rather, it has remained closely involved in the operations of Amtrak by enacting substantial pieces of legislation in an effort to improve national passenger rail service.  *See, e.g.*, Amtrak

Improvement Act of 1978, Pub. L. No. 95–421; Amtrak Reorganization Act of 1979, Pub. L. No. 96-73; Amtrak Improvement Act of 1981, Pub. L. No. 97-35; and Amtrak Reform and Accountability Act of 1997, Pub. L. No. 105-134.  Congress's most recent effort to enhance passenger rail service, the Passenger Railroad Investment and Improvement Act of 2008 (PRIIA), Pub. L. No. 110-432 (attached, in relevant part, as Exhibit 3), is the subject of this litigation.

The PRIIA directs Amtrak and the FRA to "jointly . . . develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations . . . ."  PRIIA § 207, codified at 49 U.S.C. § 24101, note.  In other words, Congress ordered the FRA, in conjunction with Amtrak, to establish standards to, among other things, "measure[ ] [the] on-time performance and delays incurred by intercity passenger trains on the rail lines of each [host] rail carrier . . . ."  *Id.*  Congress further instructed Amtrak and the FRA to "consult[ ]" with the STB and a variety of stakeholders during this process, including "rail carriers over whose rail lines Amtrak trains operate."  *Id.*  This provision gives a voice to those freight carriers that share their tracks and facilities with Amtrak.  The PRIIA also provides that if the Metrics and Standards are not completed within 180 days, then any one of the parties involved in the development of the Metrics and Standards can ask the (STB) to appoint an arbitrator to resolve any disputes through binding arbitration.  PRIIA (Ex. 3) § 207(d).  (This provision was not invoked.)  The STB, "a quasi-independent three-member body within the Department of Transportation*," Iowa, Chicago & Eastern R.R. Corp. v. Washington Cnty.*, *IA*, 384 F.3d 557, 558-59 (8th Cir. 2004), is the successor to the ICC and primarily regulates economic matters in the freight railroad industry, *see Tyrrell v. Norfolk*

*Southern Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001).  While the STB is administratively affiliated with the DOT, its decisions cannot be reviewed by the Secretary of Transportation or any other DOT official.  *See* 49 U.S.C. § 703(c).

To give teeth to these Metrics and Standards (and thereby stimulate passenger railroad improvement), Congress also authorized the STB to investigate substandard on-time performance of intercity passenger trains and to penalize host railroads when substandard performance is attributable to a railroad's failure to provide preference to Amtrak over freight transportation.  PRIIA § 213, codified at 49 U.S.C. § 24308(f).  For example, "[i]f the on-time performance of [an Amtrak train] averages less than 80 percent for any 2 consecutive calendar quarters," then the STB may initiate an investigation of its own accord.  *Id.*  Indeed, if Amtrak misses the 80% mark, the STB *must* initiate an investigation if requested to do so by Amtrak or "a host freight railroad over which Amtrak operates."  49 U.S.C. § 24308(f)(1).  During the investigation, the STB may "review the accuracy of the train performance data and the extent to which scheduling and congestion contribute to delays."  *Id.*  And, as a procedural matter – no doubt to ensure fairness – the STB must, among other things, "obtain information from all parties involved."  *Id.*

Following the investigation, the STB *may* fine – or, in the parlance of the statute, "award damages against" – the host railroad, but only if the substandard on-time performance flows from the "rail carrier's failure to provide preference to Amtrak over freight transportation as required under [49 U.S.C. § 24308]," the longstanding statutory preference requirement.  49 U.S.C. § 24308(f)(2).  In awarding damages, the STB shall consider "the extent to which Amtrak suffers financial loss as a result of host rail carrier

8

delays or failure to achieve minimum standards." *Id.* § 24308(f)(3)(a).  Further, with

respect to the payment of the damages, the PRIIA provides that the STB "shall, as it

deems appropriate, order the host rail carrier to remit the damages" to Amtrak and that

"[s]uch damages shall be used for capital or operating expenditures on the routes over

which delays" were the result of the failure of the host railroad to grant preference to

Amtrak over freight traffic.  *Id.* § 24308(f)(4)

     The FRA issued final Metrics and Standards after consulting with freight

railroads, among others.  FRA, Metrics and Standards for Intercity Passenger Rail

Service, Docket No. FRA-2009-0016, effective May 12, 2010 (attached as Exhibit 4).

This consultation included soliciting comments on a draft version of the Metrics and

Standards.  As a result of these comments, including comments from Plaintiff and some

of its individual members, the FRA and Amtrak revised the draft Metrics and Standards.

Several of these revisions benefit host freight railroads.  For example, the final version

permits almost 30% more minutes of "host-responsible delays" than the draft version had

allowed.  *Id.* at 12 (table), 21 (explaining that the change was made, in part, because of a

comment from CSX, which is a freight railroad on whose behalf Plaintiff sues).  Also, in

response to a comment from Plaintiff and several host freight railroads, the method of

calculating a standard – the so-called effective speed measure – was changed from single

quarter average to a "four-quarter rolling average":  "The FRA agrees that the result for a

single quarter could potentially reflect a seasonal skew, and has therefore adjusted the

Metrics and Standards to use a four-quarter rolling average instead." *Id.* at 16.  And to

account for concerns expressed by freight railroads about needing more time to prepare

for the implementation of one of the new standards, the "implementation schedule" was

delayed by two years "to provide additional time needed for operational and scheduling adjustments." *Id*. at 18.  In short, the FRA and Amtrak did not turn a deaf ear to the freight railroads' concerns.  To the contrary, the FRA and Amtrak acknowledged that "[g]ood-faith collaboration between Amtrak and host railroads . . . will be needed to ensure that the implementation of the above Section 207 standards is a success." *Id.* at 33.

II.   <u>This Action</u>

Plaintiff claims that § 207 of the PRIIA improperly delegates "lawmaking and rulemaking authority" to a private entity (*i.e.*, Amtrak) insofar as it authorized Amtrak to "jointly" issue the Metrics and Standards.  Compl. ¶ 5.  To support the notion that Amtrak is a private entity, Plaintiff's complaint invokes 49 U.S.C. § 24301(a).  Complaint, Aug. 19, 2011 (Compl.), Doc. No. 1, ¶ 6.  Section 24301(a) states that Amtrak "is not a department, agency, or instrumentality of the United States Government" and shall be "operated and managed as a for profit corporation."  Compl. ¶ 49.  Plaintiff presents its basic allegation as two separate claims.  In its first claim, Plaintiff alleges that § 207's grant of authority violates the non-delegation doctrine and the separation-of-powers doctrine.[2]  Compl. ¶ 47-51.  And in its second claim, Plaintiff alleges that § 207's grant of authority violates the Due Process Clause of the Fifth Amendment because it "vest[s] the coercive power of the government in [an] interested private part[y]."  Compl. ¶53.  Amtrak is an interested party, according to the Plaintiff, because Amtrak can receive damage awards under § 213 of the PRIIA.  Compl. ¶ 3.  As

---

[2] Defendants understand the basis of Plaintiff's invocation of the separation-of-powers doctrine to be that Congress has allegedly delegated executive power – the power to make rules – as well as legislative power to Amtrak, and has thereby infringed on the Executive Branch's prerogatives.  *See Pittson Co. v. United States*, 2002 WL 32172290, at *3 n.12 (E.D. Va. Aug. 20, 2002) (discussing a similar claim).

relief, Plaintiff seeks, among other things, a declaration that § 207 is unconstitutional and that the Metrics and Standards are void.  Compl. at p. 17.

## ARGUMENT

I.   Congress's Delegation of Authority to Amtrak is Constitutional Even if Amtrak is a Private Entity Because the Government Retained Sufficient Control Over the Exercise of Its Authority.

Plaintiff's claims lack merit even if, as Plaintiff claims, Amtrak is a private entity. Private parties can exercise governmental power if the Government has the final say regarding the exercise of its coercive authority.  Both of Plaintiff's claims rest on the notion that Amtrak exercised coercive authority without adequate governmental oversight.  Compl. ¶¶ 48, 51, 53, 54.  Not so.  Amtrak acted under the auspices of the Government and, in any case, exercised only advisory authority.

The law does not flatly prohibit private parties from exercising governmental authority.  *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128-29 (3d Cir. 1989) (abrogated on other grounds).  Rather, it requires that any delegation of authority be accompanied by constraints sufficient to ensure that the Government has the final say regarding the exercise of its coercive power.  Thus, the Supreme Court upheld the statutory scheme at issue in *Sunshine Anthracite*, under which groups of coal producers could set prices for coal, because those prices became effective only if approved by a Government agency, the National Bituminous Coal Commission. 310 U.S. at 388.  *Frame* tells a similar story.  Under the statute at issue in that case, the Cattlemen's Board – a group of private cattle ranchers and importers – collected assessments from the cattle industry and took "the initiative in planning how those funds

11

will be spent." *Frame*, 885 F.2d at 1123, 1128.  The Third Circuit upheld the statute because "the amount of government oversight of the program is considerable." *Id.* at 1128.  Notably, the Secretary of Agriculture appointed and could remove the members of the Board, and the Secretary had to approve budget proposals before they would become effective.  *Frame*, 885 F.2d at 1128-29.  And in *Pittston*, the Fourth Circuit upheld a statute that permitted a private board to decide whether to refer a coal company to the Secretary of Treasury for an enforcement action (for the nonpayment of certain premiums), because it viewed the Board's role as "just an 'advisory' role"; the Secretary ultimately made the decision of whether to impose a penalty.  368 F.3d at 397.

The Government exercised ample control over Amtrak.  The precedent rehearsed above demonstrates the importance of a Government-approval requirement to the constitutionality of a delegation.  Government approval was required prior to power being exercised here:  Amtrak could not enact the Metrics and Standards on its own.  49 U.S.C. § 24101, notes, § 207, Metrics and Standards.  The Metrics and Standards went into effect only because the FRA approved of, and issued, them.  *Id.*

Also, as demonstrated by *Frame*, structural controls (such as appointment and removal powers) influence the determination of whether the Government sufficiently monitored the exercise of its authority.  *Frame*, 885 F.2d at 1128-29; *Lebron*, 513 U.S. at 397 (discussing structural controls of Amtrak).   The Government's levers of structural control over Amtrak are abundant.   First, the President of the United States, with the consent of the Senate, appoints all eight of the externally appointed board members,  49 U.S.C. § 24302(a); and, the President may remove those board members, *see Holdover and Removal of Members of Amtrak's Reform Bd.*, 2003 WL 24170382, at *3-5 (Op. Off.

of Legal Counsel  Sept. 22, 2003).  Second, Amtrak depends heavily on federal appropriations to survive in its current form.  Consolidated Financial Statements (Ex. 2) at 6 ("The Company has a history of recurring operating losses and is dependent on subsidies from the Federal Government to operate the national passenger rail system and maintain the underlying infrastructure.").  In Fiscal Year 2011 alone, the Government provided Amtrak with around $1.5 billion.  *Id.*  Finally, Congress, by statute, defines the goals of, and assigns tasks to, Amtrak, *see, e.g.*, 49 U.S.C. §§ 24101(c), 24710, 24902.

Amtrak's role would be unproblematic even without these controls, because, insofar as fines are concerned, it exercised only advisory authority.   In *Pittston*, the Fourth Circuit deemed the private body's power to refer a coal company to the Secretary of Treasury for a possible enforcement action as advisory.  368 F.3d at 397.  Similarly, the Metrics and Standards here act as a mechanism to determine when a freight railroad can be subject to an investigation by the STB.  Recall, "[i]f the on-time performance of [an Amtrak train] averages less than 80 percent for any 2 consecutive calendar quarters," as determined according to the Metrics and Standard, then the STB may initiate an investigation of its own accord.  49 U.S.C. § 24308(f)(1).  And if Amtrak misses the 80% mark, the STB *must* initiate an investigation if requested to do so by Amtrak or a host freight railroad over which Amtrak operates.  *Id.*

The Metrics and Standards, then, with respect to fines, merely act as a trigger to an STB investigation.  To be clear, under the PRIIA, the STB cannot fine railroads for failing to satisfy the Metrics and Standards; the STB can fine railroads and impose other relief only if they fail to abide by the statutory preference requirement.  49 U.S.C. § 24308(f)(2); 49 U.S.C. § 24308(c) (preference requirement) ("Except in an emergency,

intercity and commuter rail passenger transportation provided by or for Amtrak has

preference over freight transportation in using a rail line, junction, or crossing unless the

[STB] orders otherwise under this subsection." ).  In short, with respect to fines, the

power exercised through the Metrics and Standards is essentially the advisory power of

referral, and Amtrak's involvement is, therefore, constitutional.[3]

Plaintiff highlights three concerns that underlie the limits on delegations of

governmental power:

> (1) Accountability – "Prohibiting the delegation of rulemaking authority to private
> entities ensures governmental accountability and protects the rights of regulated
> parties[,]" Pl.'s Br. at 22;
> (2) Expertise – "Delegating rulemaking power to private entities not only permits
> the government to diminish or avoid its responsibility for controversial decisions,
> it places the coercive power of the government in parties without regulatory
> expertise[,]" *id.* at 23;
> (3) Bias – "[P]rivate entities lack the impartiality of government regulators and
> may be biased by their own self-interest[,]" *id.*

But the involvement of Amtrak in the joint creation of the Metrics and Standards does not

raise any of these concerns.  First, Amtrak is accountable to the public.  The President of

the United States appoints its board members,  one of which is the Secretary of

Transportation, 49 U.S.C. § 24302, and he may remove them, *see Holdover and Removal*

*of Members of Amtrak's Reform Bd*., 2003 WL 24170382, at *3-5.  What is more,

Amtrak's survival depends on congressional appropriations.  Consolidated Financial

Statements (Ex. 2) at 6.  Second, expertise is not lacking.  The FRA provides regulatory

expertise:  It has been regulating the railroad industry since 1966.  *See* 49 U.S.C.§ 103.

---

[3] Plaintiff argues that the Metrics and Standards will affect freight railroads because the PRIIA requires that
Amtrak and the freight railroads "incorporate" them into their "access and service agreements" (*i.e.*, the
agreements that relate to Amtrak's usage of the freight railroads' tracks and facilities) "to the extent
practicable."  Plaintiff's Memo. in Support of Summary Judgment, Dec. 2, 2011 (Pl.'s Br.), Doc. No. 8, at
28, 33.  But, as Plaintiff acknowledges, this incorporation has not occurred yet, *id.* at 19-20, and given the
flexibility of the statutory language ("to the extent practicable"), the nature of the incorporation is not clear
– and could vary by contract.  Thus, at this time, the equivocal incorporation requirement does not establish
that Amtrak has exerted non-advisory governmental power.

Finally, the PRIIA does not permit biased rulemaking.  The FRA is a Government agency, and it jointly developed and approved the Metrics and Standards, 49 U.S.C. § 24101, notes, § 207, Metrics and Standards, and Amtrak is accountable to governmental officials, namely, Congress and the President.

Moreover, there is no evidence Amtrak acted in a biased fashion.  Plaintiff highlights three supposed examples of bias, but none is persuasive.  First, Plaintiff criticizes the Metrics and Standards because they set standards that require dramatically better performance from Amtrak.  Pl.'s Br. at 30-31.  But this demonstrates that Amtrak and the FRA heeded Congress' call for meaningful improvement, not that they acted in a biased fashion, *see* PRIIA (Ex. 3) § 228(a)(14) ("This division makes meaningful and important reforms to increase the efficiency, profitability and on-time performance of Amtrak's long-distance routes."); meaningful improvement requires meaningful change. Second, Plaintiff laments that the Metrics and Standards direct the FRA to use Amtrak-created conductor reports to compile statistics regarding the performance of freight railroads.  Pl.'s Br. at 31.  As the FRA and Amtrak explained in response to a comment objecting to the use of these reports, however, "no uniform database for minutes of delay across the Amtrak system exists that can replace Amtrak's conductor delay reports." FRA, Metrics and Standards (Ex. 4) at 20.  And, in any case, if the STB gets involved, it "has [the] authority to review the accuracy of the train performance data" and "shall obtain information from all parties involved." 49 U.S.C. § 24308(f)(1).  Finally, Plaintiff denigrates the "pure run time" standard, which measures the time it takes for an Amtrak train to travel between two points with no delays, as "the equivalent of drawing up D.C.-area bus schedules on the assumption that the buses will encounter no traffic on the

Washington Beltway." Pl.'s Br. at 31-32.  Plaintiff's metaphor is colorful but inapt.  Pure run time is not used as a synonym for scheduled run time.  It is used to determine the extent of delays on Amtrak routes, so that the situations creating the delays can be thoughtfully addressed.  FRA, Metrics and Standards (Ex. 4) at 13, 20.  To borrow Plaintiff's metaphor, just as one would not try to determine the toll traffic takes on travel times around the Beltway by looking only at actual travel times, one would not use scheduled travel times to determine the extent of delays on a train route.

Contrary to Plaintiff's allegations, the conduct of the FRA and Amtrak during the development of the Metrics and Standards demonstrates the evenhandedness of their decision making.  The FRA and Amtrak modified the Metrics and Standards that they had originally proposed to account for concerns voiced by freight railroads.  To wit, they increased the limits of permissible freight railroad caused delays, changed the calculation of a standard (the measure of effective speed), and delayed implementation of another standard.  *See* above § X.  Alleged bias never looked so fair.

II.     **Plaintiff's Claims Fail Because Amtrak is the Government for Purposes of the Constitution's Due Process Clause and Non-Delegation and Separation-of-Powers Principles.**

Both of Plaintiff's claims rest on the proposition that Amtrak is a private entity.  Compl. ¶ 48 (Claim One) ("The Constitution bars Congress from delegating to *private* parties the power to regulate the conduct of other private parties.") (emphasis added); ¶ 53 (Claim Two) ("Vesting the coercive power of the government in interested *private* parties violates the due process rights of regulated third parties, as secured by the Fifth Amendment to the United States Constitution.") (emphasis added).  Though the Court need not address the nature of Amtrak to decide this case, the proposition forwarded by

16

Plaintiff is false.  For purposes of the Constitution's non-delegation principle, separation-of-powers principle, and Due Process Clause, Amtrak is part of the Government.  Indeed, the Supreme Court stated in *Lebron* that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution."  513 U.S. at 394.  This statement squarely forecloses Plaintiff's Due Process claim.  *See, e.g., J. McIntyre Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 2786 (2011) ("The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power.") (plurality opinion).   And their non-delegation and separation-of-powers claim fares no better:  Plaintiff gives no reason why the rule that applies to its Due Process claim should not equally apply to essentially the same claim when it is couched in "non-delegation" or "separation-of-powers" terms.

*Lebron* involved a constitutional challenge to Amtrak's ability to regulate the content of a billboard in one of its stations.  513 U.S. at 376-77.  Amtrak, through a contractor, leased billboard space to a controversial artist.  *Id.* at 376.  The leasing contract stipulated that Amtrak retained the authority to prohibit billboard displays based on the content of the display.  *Id.* at 376.  The artist proposed a politically charged work criticizing the Coors Brewing Company.  *Id.* at 377.  Amtrak prohibited the artist from posting the piece because of its political content.  *Id.*  The artist sued, alleging, among other things, that Amtrak violated the First Amendment.  *Id.*  Amtrak countered that it was a private corporation, *id.* at 392, as demonstrated by Congress's statement that Amtrak "is not a department, agency, or instrumentality of the United States Government . . . ," 49 U.S.C. § 24301(a)(3).   The Court rejected Amtrak's argument.  It acknowledged that Congress could define the nature of Amtrak "for purposes of matters

that are within Congress's control," such as "whether [Amtrak] is subject to statutes that impose obligations or confer powers upon Government entities," and whether Amtrak will enjoy "those inherent powers and immunities of Government agencies that it is within the power of Congress to eliminate." *Lebron*, 513 U.S. at 392.   But the Court explained that Congress does not have the authority to make the "final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Id.* at 392.  Why not?  Congress cannot overrule the Constitution.  "If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment." *Id.* at 392.

The Court determined that Amtrak was "by its very nature" an agency or instrumentality of Government for "for the purpose of individual rights guaranteed against the Government by the Constitution." *Id.* at 393-94.   The decision was based on past practice and "reason itself." *Id.* at 397, 400.  With respect to past practice, the Court explained that it and Congress had long treated Government-created and -controlled corporations as part of the Government.  *Id.* at 396.  As for reason, the Court highlighted the indicia of the Government's control of Amtrak:  (i) Amtrak "was created by a special statute, explicitly for the furtherance of federal governmental goals"; and, (ii) the Government had the authority to appoint six of the eight externally appointed members of the Amtrak board of directors.  *Id.* at 397.  In short, for purposes of the claim in *Lebron*, Amtrak was part of the Government.

Nothing regarding Amtrak's status has changed – at least not in Plaintiff's favor. Of course, it remains true that Amtrak was created by statute to further governmental goals. Indeed, Congress has continued to refine its view of the purposes served by Amtrak in light of changing circumstances; Amtrak is not the forgotten vestige of a by-gone era. For example, in the PRIIA, Congress noted that there is a need to "maintain Amtrak as a national passenger rail system" because "[l]ong-distance trains [ ] provide transportation during periods of severe weather or emergencies that stall other modes of transportation," such as the September 11, 2001 terrorist attacks. PRIIA (Ex. 3) § 228. The other evidence of Governmental control of Amtrak is stronger today that it was when *Lebron* was decided, because the Government has an even bigger say in the composition of Amtrak's board of directors. Instead of appointing six of eight externally appointed board members, the Government now appoints all eight of the externally appointed board members. 49 U.S.C. § 24302(a). The Government also has a hefty financial stake in Amtrak. The Government owns 92% of the outstanding shares of Amtrak Stock. Consolidated Financial Statements (Ex. 2) at 17-18**.** And as Plaintiff acknowledges, Compl. ¶ 23. What is more, Amtrak relies on federal appropriations to survive in its current form. Consolidated Financial Statements (Ex. 2) at 6,12**.**

In accord with *Lebron*, for purposes of Plaintiff's claims, Amtrak is an agency or instrumentality of the Government. Little needs to be said about the application of *Lebron* to Plaintiff's due process claim. The Court concluded that Amtrak was an entity of the Government for "the purpose of individual rights guaranteed against the Government by the Constitution." *Lebron*, 513 U.S. at 394. The facts underlying the holding in *Lebron* have not changed in any way that undercuts the holding, and a due

process claim seeks to protect rights of the individual against the Government, *see, e.g., J. McIntyre Mach., Ltd.*, 131 S.Ct. at 2786 (plurality).  Thus, this claim fails.  Hardly more needs to be said about Plaintiff's claims under the non-delegation and separation-of- powers principles.  Plaintiff's claims under these principles are virtually identical to their due process claims.  *Compare* Compl. ¶¶ 47-51 *with* Compl. ¶¶ 52-54.  Plaintiff recognizes the close similarity, as it relies heavily on a single case, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311-312 (1936), as support for both claims, Pl.'s Br. at 21-22, 32, and refers to its claims in the singular, Pl.'s Br. at 27 ("Here, of course, the constitutional *claim* at issue involves a structural limitation arising from the Constitution's separation-of-powers principle.") (emphasis added).  Observers have also recognized the near identity of such claims.  David Horton, *Arbitration as Delegation*, 86 New York Univ. L. Rev. 437, 473-74 (2011) (discussing the similarity of due process and non-delegation claims);[4] *Pittson Co.*, 2002 WL 32172290, at *3 n.12 (explaining the similarity of non-delegation and separation-of -powers claims).  Given this similarity, the Court should not adopt a different test for determining governmental status to resolve Plaintiff's non-delegation or separation-of-powers claim, as opposed to its due process claim.

Both of Plaintiff's claims relate to whether Amtrak is part of the Government. The Court in *Lebron* sensibly considered indicia of Government control to determine whether Amtrak could take the blame, as a governmental entity, for its actions insofar as they affected individual rights.  The question now is whether Amtrak can take credit for

---

[4] Notably, Plaintiff's due process argument is a substantive due process argument.  They base their substantive due process claim on *Carter Coal Co.*, 298 U.S. at 311-312.  Pl.'s Br. at 32-33. This *Lochner*-era decision rests upon substantive due process notions of "arbitrary' and otherwise unfair governmental action.  *Carter Coal*, 298 U.S. at 311-12; *Synar v. United States*, 626 F.Supp. 1374, 1383 n.8 (D.D.C. 1986) (three judge panel including then-Judge Scalia) (noting that the *Carter* "Court's holding appears to rest primarily upon denial of substantive due process rights"); *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 337 n.9 (9th Cir. 1990) (noting the "substantive due process origins" of the *Carter Coal* holding).

being part of the Government – under the constitutional provisions invoked by Plaintiff – insofar as its actions affect individual rights.  Coins have two-sides, not one.  The same test should apply.

Plaintiff's argument that Amtrak is a private entity for purposes of its suit is unconvincing.   Plaintiff relies in part on Congressional enactments and statutory purpose.  It emphasizes the statement in 49 U.S.C. § 24301(a)(3) that Amtrak "is not a department, agency, or instrumentality of the United States Government . . . ."  Pl.'s Br. at 26.  It notes that Congress deleted Amtrak from the list of mixed-ownership Government corporations.  *Id.* at 27-28.  And it points to the PRIIA's statutory purpose: "Given that PRIIA's purpose and effect is to boost the bottom-line of a for-profit corporation, Amtrak is plainly a private actor for purposes of the statute." *Id.* at 28. These arguments fail as a matter of logic and precedent.  It is Amtrak's status for purposes of two constitutional principles and the Due Process Clause that matters, not its status under the PRIIA or any other statute.[5]  Plaintiff does not allege a violation of the PRIIA; rather, it argues the PRIIA violates the Constitution.  And, as the Supreme Court decided in *Lebron*, Congress does not have the last word when it comes to determining the status of Amtrak for constitutional questions, such as whether Amtrak is an agency or

---

[5] Defendants do not dispute that Congress can define the nature of an entity such as Amtrak for purposes of the reach of its own statutes.  As the Court stated in *Lebron*, Congress's view of Amtrak "is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control-for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* . . , the Federal Advisory Committee Act, 5 U.S.C.App. § 1 *et seq.,* and the laws governing Government procurement, *see* 41 U.S.C. § 5 *et seq.* . . . ." *Lebron*, 513 U.S. at 392.  Thus, for example, Amtrak is not subject to the APA, *see, e.g., United States v. Jackson*, 381 F.3d 984, 990 (10th Cir. 2004), and is not the government for purposes of the False Claims Act, *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 490-92 (D.C. Cir. 2004).

instrumentality of the Government for purposes of the Constitution's non-delegation principle.[6]  *See Lebron*, 513 U.S. at 392-93.

Plaintiff also cites *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 490 (D.C. Cir. 2004), in which the court stated, "Amtrak is not the Government." But, as with most things, context is king.  And the context in *Totten* was that the court was assessing the status of Amtrak under the False Claims Act, not the Constitution.  *Id.* at 491-92.  Indeed, the D.C. Circuit explained that "the Supreme Court deemed [49 U.S.C. § 24301(a)(3)] assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control. . . .Totten offers no reason, and we can think of none, why *False Claims Act coverage* is not a matter within Congress's control."  *Totten*, 380 F.3d at 492 (emphasis added) (internal quotation marks omitted).

Surprisingly, Plaintiff even tries to turn *Lebron* to its advantage.  Plaintiff asserts that *Lebron* held that:  (i) Congress's view of Amtrak is dispositive of Amtrak's status for purposes of statutes like the PRIIA; and (ii) Congress's determination is relegated to the sideline only for constitutional claims of individual rights protected by the Constitution, and not for "constitutional claim . . . involv[ing] a structural limitation arising from the

---

[6] Plaintiff maintains that "Amtrak has private shareholders, and operates as commercial carrier, financially, administratively, and legally distinct from the United States."  Pl.'s Br. at 26.  These assertions are irrelevant or incorrect.  That Amtrak has private shareholders does not mean that it is a private entity for purposes of Plaintiff's claims.  After all, Amtrak had private shareholders when *Lebron* was decided, and the key inquiry is whether Amtrak was created by the Government and remains in the Government's control.  The assertion that Amtrak "operates as [a] commercial carrier" similarly does not matter.  Amtrak operates as a commercial carrier in the sense that a statute directs that Amtrak be operated as a for-profit entity.  49 U.S.C. § 24301(a)(2).  But that was true at time of *Lebron*, and the Court did identify this fact as a relevant point for determining Amtrak's status.  The assertion that Amtrak is financially distinct from the United States is untrue:  Amtrak receives sizeable infusions of cash from the Federal Government every year.  Amtrak Consolidated Financial Statements (Ex. 2) at 6.  Similarly false is the contention that Amtrak is administratively distinct:  The President of the United States appoints all eight externally appointed administrators, *i.e.*, members of the board of directors.  49 U.S.C. § 24302(a).  Finally, the allegation that Amtrak is legally distinct is either irrelevant or false:  It is irrelevant to the extent Plaintiff refers to Amtrak's status under various statutes, and it is false to the extent Plaintiff is referring to the claims at issue in this case.

Constitution's separation-of-powers principle."  Pl.'s Br. at 27.  Neither supposed holding

helps Plaintiff.  Plaintiff's first point is a nonsequitur.  As explained above, it is not

Amtrak's status under the PRIIA that matters, but its status for purposes of the

constitutional provisions invoked by Plaintiff.  And Plaintiff's second point is no more

persuasive.  Plaintiff raises a due process claim, which is a claim to vindicate an alleged

"individual right[ ] guaranteed against the Government by the Constitution," *Lebron*, 513

U.S. at 394, regardless of its genesis in a structural principle.  *See J. McIntyre Mach.,

Ltd.*, 131 S.Ct. at 2786 (plurality) ("The Due Process Clause protects an individual's right

to be deprived of life, liberty, or property only by the exercise of lawful power.").

Indeed, in *Bond v. United States*, the Supreme Court explained that "[t]he structural

principles secured by the separation-of-powers protect the individual as well [as the

branches of government]."  131 S. Ct. 2355, 2365 (2011).  In any case, as explained

earlier, irrespective of the label stamped on Plaintiff's claims, the *Lebron* test gets at the

central issue underlying both of them:  Are there sufficient indicia of Government control

to demonstrate that Amtrak is part of the government for purposes of these claims?

There are.[7]

III.    Section 207 of the PRIIA Comports with the Due Process Clause Even if Amtrak
        is a Private Entity Because a Relaxed Standard Applies and Amtrak's Alleged
        Financial Interest is Weak.

        Plaintiff contends that the PRIIA violates the Due Process Clause of the Fifth

Amendment by granting governmental authority to an economically interested private

party (*i.e.*, Amtrak).   Compl. ¶¶ 52-54.  Even if the Court determines that Amtrak is a

---

[7] That Plaintiff's claims all present the same basic legal question is driven home by Plaintiff's use of the
singular "claim" when discussing the issue:  "Here, of course, the constitutional *claim* at issue involves a
structural limitation arising from the Constitution's separation-of-powers principle."  Pl.'s Br. at 27
(emphasis added).

private entity for purposes of Plaintiff's claims, this contention fails for the reason set out in first section of this brief.  But the contention fails for another reason.  The Due Process Clause does not prohibit a potentially interested party from exercising governmental authority when (1) an unbiased governmental actor serves as a filter between the potentially interested party and the governed, and (2) the potentially interested party's interest in acting in a biased fashion is weak.  *See Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980).  Indeed, the Due Process Clause is particularly forgiving of the involvement of a potentially interested party when the involvement takes the form of rulemaking, as opposed to adjudication.  *Friedman v. Rogers*, 440 U.S. 1, 18 (1979) (concluding that there was no constitutional violation when a plaintiff was regulated by an administrative board dominated by bitter industry rivals).

Plaintiff relies heavily on *Carter Coal*, 298 U.S. 238.  Pl.'s Br. at 32-34.  In that *Lochner*-era decision, the Court invalidated wage and hour restrictions set by certain industry participants because of the potential biases of those participants.  *Carter Coal*, 298 U.S. at 311.  But this case differs from *Carter Coal* in at least two crucial respects: (1) with respect to fines, the Metrics and Standards merely act as a trigger to an investigation by a disinterested governmental agency, the STB, which may issue fines and other relief on the basis of a separate statutory provision (the preference requirement), not the Metrics and Standards; and (2) the private party in *Carter Coal* acted alone,[8] whereas here, Amtrak acted with a unbiased Government partner, the FRA.

In light of these differences, *Marshall v. Jerrico, Inc.* serves as a more appropriate analog for this case than *Carter Coal*.  In *Jerrico*, a restaurant chain was fined by the Department of Labor for child labor violations after a hearing before an administrative

---

[8] Again, Defendants assume for purposes of this argument that Amtrak is a private entity.

law judge (ALJ).  446 U.S. at 240-41.  The restaurant chain sued, arguing that the administrative scheme violated the Due Process Clause because money collected as civil penalties went to the agency to defray administrative costs and therefore made the agency representative at the administrative hearing an interested party.  446 U.S. at 241.  The Court rejected the claim.  First, although the Court did "not say with precision" what standard applied, it did apply a more relaxed due process standard to the agency representative than it would apply to an adjudicator because, ultimately, the disinterested ALJ, not the agency representative, decided what penalty to dole out.[9]  446 U.S. at 247-250.  Second, "under a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larki*n, 421 U.S. 35, 47 (1975), the Court noted that the likelihood that the agency representative would act in a biased fashion was remote because his salary was fixed and the budgetary consequences for the agency were minimal.  446 U.S. at 250-252.

Like the agency representative in *Jerrico*, Amtrak lacks the final word.  Amtrak does not issue any fines, the STB does.  And the STB issues fines only if a freight railroad has violated the separate statutory preference requirement.  49 U.S.C. § 24308(a)(2).  Thus, as in *Jerrico*, the institutional arrangement in this case warrants a relaxed due process standard.

Not only does the institutional arrangement call for a relaxed due process standard, a la *Jerrico*, but the regulatory context does as well.  *Friedman v. Rogers*, 440 U.S. 1 (1979), is instructive.  The Plaintiff in *Friedman* was a commercial optician in

---

[9] With regard to adjudicators, a common formulation of the due process standard states that an official lacks the constitutionally required neutrality if he harbors a pecuniary interest in the outcome of the case that "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true. . . ."  *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60, 93 (1972).

Texas.  *Id.* at 5-6.  He challenged the constitutionality of the Texas Optometry Board because professional opticians – the bitter professional rivals of commercial opticians – dominated the regulatory board's ranks, holding four of six membership slots.  *Id.* at 3-6.  The Supreme Court concluded that the Plaintiff had "no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry."  *Id.* at 18.  Following *Friedman*, courts have applied a relaxed due process standard in the rulemaking context.  *N.Y. State Dairy Foods v. Ne. Dairy Compact Comm'n*, 198 F.3d 1, 13-14 (1st Cir. 1999) ("The Due Process Clause sets a significantly lower bar for legislative functions [that adjudicative ones].");  *White Eagle Co-Op Assoc. v. Johanns*, 508 F. Supp. 2d 664, 672 (N.D. Ind. 2007) (same).

Under the relaxed due process standard applicable in this case, Amtrak's role in helping develop the Metrics and Standards easily withstands scrutiny.   "[A] realistic appraisal of psychological tendencies and human weakness" indicates that the likelihood that Amtrak would act in a biased fashion was remote.  *Larkin*, 421 U.S. at 47.  First, the statute partnered Amtrak with the FRA, which Plaintiff does not allege was biased.  As the FRA could – and would – strip any bias out of the Metrics and Standards, there would have been little point in Amtrak trying to shade the Metrics and Standards in its favor.

Second, the structure of Amtrak and political realities would have blunted any interest by Amtrak to act in a biased fashion.  Amtrak is politically accountable:  the Secretary of Transportation serves as one of the board of directors; members of its board of directors can be removed by the President of the United States, *Holdover and Removal of Members of Amtrak's Reform Bd.*, 2003 WL 24170382, at *3-5; and it depends on continuing congressional appropriations to retain its current form, Consolidated Financial

Statement (Ex. 2) at 6.   Moreover, the parties who would be adversely affected by biased Metrics and Standards – major freight railroads – undoubtedly have the political strength necessary to inform the political branches of any perceived unfairness in the regulatory process.   *See* Lobbying Report, Association of American Railroads, 2011, at 1 (stating that the Association spent over $4.5 million in lobbying activities in *one quarter* of 2011) (attached as Exhibit 5).   In this environment, Amtrak would have nary an interest in putting a thumb on the scale.

Finally, Amtrak had only a weak interest in biased Metrics and Standards. Violations of the Metrics and Standards do not produce fines.   Only violations of the separate preference requirement may result in fines.   The word "may" in the last sentence is important:   Even if the STB identifies a violation of the preference requirement, it need not necessarily fine the freight railroad.   Thus, for Amtrak to receive any benefit from a fine depends on contingency (a freight railroad failing to satisfy the Metrics and Standards) piled on contingency (the STB opening an investigation) piled on contingency (the STB finding a violation of the separate preference requirement) piled on contingency (the STB deciding to issue a fine).   More is required:   "[I]t is exceedingly improbable that . . . decisions would be distorted by some expectation that all of these contingencies would simultaneously come to fruition." *Jerrico*, 446 U.S. at 252.   But there is no more.[10]

---

[10] Plaintiff cites two Supreme Court cases other than *Carter Coal* to support its due process claim, namely, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 805 (1987), and *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973).   Pl.'s Br. at 32.   Neither case carries the day.   In *Young*, the Court held that a special prosecutor in a contempt action had an impermissible conflict of interest because he represented the client on whose behalf the underlying court order was entered.   481 U.S. at 805-806.   The Court distinguished *Young* from *Jerrico* because of the certainty that the special prosecutor would be subject to the potentially distorting influence.   *Id.* at 807.   There is no such certainty in this case given the involvement of the FRA, the structure of Amtrak, and the contingent nature of any financial interest, as explained in the text.   *Gibson* fares no better.   It arose in the adjudicatory context, which, as explained in the text, is subject to a different due process analysis.

## CONCLUSION

The Court should enter judgment in favor of defendants and dismiss Plaintiff's

suit.

Dated:  February 3, 2012                    Respectfully submitted,

                                                   TONY WEST
                                                 Assistant Attorney General

                                                 RONALD C. MACHEN JR
                                               United States Attorney

                                                 SANDRA M. SCHRAIBMAN
                                               (D.C. Bar No. 188599)
                                               Assistant Branch Director, Federal
                                               Programs Branch, Civil Division

                                              __/s/ Justin M. Sandberg_____
                                               JUSTIN M. SANDBERG
                                               (Ill. Bar No. 6278377)
                                               Trial Attorney
                                               U.S. Dept. of Justice, Civil Division,
                                             Federal Programs Branch
                                             20 Mass. Ave., NW, Rm. 7302
                                             Washington, DC 20001
                                             (202) 514-5838 phone
                                             (202) 616-8202 fax
                                             justin.sandberg@usdoj.gov

                                               Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ASSOCIATION OF AMERICAN ) | |
| RAILROADS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-CV-1499 (JEB) |
| ) | |
| DEPARTMENT OF TRANSPORTATION, ) | |
| RAY LAHOOD, Secretary of ) | |
| Transportation, FEDERAL RAILROAD ) | |
| ADMINISTRATION, JOSEPH C. SZABO, ) | |
| Administrator, Federal Railroad ) | |
| Administration, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S**
**STATEMENT OF UNDISPUTED FACTS**

Statement of Undisputed Facts in Support of Summary Judgment

1.  The President of the United States, with the consent of the Senate, appoints all

    eight of the externally appointed members of the Amtrak Board of Directors.  49

    U.S.C. § 24302(a).

2.  The Secretary of Transportation is an *ex officio* member of the Amtrak Board of

    Directors.  *Id.*

3.  The Government owns 109,396,994 shares of the 118,782,688 outstanding shares

    of Amtrak stock.  Nat'l R.R. Pass. Corp and Sub., Consolidated Financial

    Statements for the Years Ended Sept. 30, 2011 and 2010, at 17-18 (Dec. 2011)

(attached to Defendants' Memorandum in Support of Summary Judgment as Exhibit 2).

4.  Amtrak has a "history of recurring operating losses and is dependent on subsidies from the Federal Government to operate the national passenger rail system and maintain the underlying infrastructure.  These subsidies are usually received through annual appropriations."  *Id.* at 6.

5.  In Fiscal Year 2011, the Government provided Amtrak with around $1.5 billion in appropriations.  *Id.* at 6**.**

6.  Congress has articulated goals for Amtrak, including that it "provide additional or complementary intercity transportation service to ensure mobility in times of national disaster or other instances where other travel options are not adequately available."  49 U.S.C. § 24101(c)(9).

7.  The Passenger Rail Investment and Improvement Act of 2008 (PRIIA) directs Amtrak and the Federal Railroad Administration (FRA) to "jointly . . . develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations . . . ."  PRIIA, Pub. L. No. 110-432 (attached, in relevant part, as Exhibit 3 to Defendants' Memorandum in Support of Summary Judgment), § 207, codified at 49 U.S.C. § 24101, note.

8.  The FRA issued final Metrics and Standards after consulting with, among others, freight railroads.  FRA, Metrics and Standards for Intercity Passenger Rail Service, Docket No. FRA-2009-0016, effective May 12, 2010 (attached to Defendants' Memorandum in Support of Summary Judgment as Exhibit 4).

Response to Plaintiff's Statement of Undisputed Facts

1.      Not disputed.

2.      Not disputed, but immaterial to summary judgment.

3.      The first sentence is undisputed.  The second sentence is disputed to the extent
        it suggests that these agreements alone define the relationship between
        Amtrak and host freight railroads, as statutory provisions, like 49 U.S.C. §
        24308(c), also play a part.  But this potential dispute is not material to
        summary judgment.

4.      Not disputed.

5.      To the extent the word "simultaneously" in the first sentence means "on
        March 13, 2009," this paragraph is not disputed.

6.      Defendants do not dispute that "[o]n May 6, 2010, Amtrak and the FRA
        jointly issued their responses to the comments" on the proposed Metrics and
        Standards, but state that whether Amtrak and the FRA issued a final rule is a
        legal conclusion, not a statement of fact.

7.      Not disputed, but immaterial to summary judgment.

8.      Defendant is without knowledge of the truth of this allegation.  In any event,
        this allegation is immaterial to summary judgment because it relates to
        jurisdiction, rather the merits of the dispute.  *See Kirkham v. Societe Air
        France*, 429 F.3d 288, 294 (D.C. Cir. 2005).

9.      Defendants dispute that Quarterly Reports demonstrate that the Metrics and
        Standards "are not being met on many routes."  The Reports demonstrate, at
        most, that the Metrics and Standards *were* not met during the time period

3

measured; they do not demonstrate current (non)compliance.  But this dispute

is immaterial to summary judgment because it does not pertain to the

constitutionality of the metrics and standards.

Dated:  February 3, 2012                    Respectfully submitted,

                                            TONY WEST
                                            Assistant Attorney General

                                            RONALD C. MACHEN JR
                                            United States Attorney

                                            SANDRA M. SCHRAIBMAN
                                            (D.C. Bar No. 188599)
                                            Assistant Branch Director, Federal
                                            Programs Branch, Civil Division

                                            __/s/ Justin M. Sandberg_____
                                            JUSTIN M. SANDBERG
                                            (Ill. Bar No. 6278377)
                                            Trial Attorney
                                            U.S. Dept. of Justice, Civil Division,
                                            Federal Programs Branch
                                            20 Mass. Ave., NW, Rm. 7302
                                            Washington, DC 20001
                                            (202) 514-5838 phone
                                            (202) 616-8202 fax
                                            justin.sandberg@usdoj.gov

                                            Attorneys for Defendants