**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATION OF AMERICAN RAILROADS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  11-1499 (JEB)** |
| **DEPARTMENT OF TRANSPORTATION,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

We all know Amtrak – the federally chartered corporation that has provided intercity and commuter train service to Americans for more than forty years.  But what *is* Amtrak? Is it a private entity? Or is it part of the government? While courts have previously addressed these questions in various other contexts, it is on their resolution that much of this case hinges.

Section 207 of The Passenger Railroad Investment and Improvement Act of 2008 (PRIIA) requires the Federal Railroad Administration (FRA) and Amtrak to "jointly" develop standards to evaluate the performance of Amtrak's intercity passenger trains.  Consistent with this mandate, the FRA and Amtrak issued Metrics and Standards for measuring Amtrak's on-time performance and minutes of delay.  In this suit, Plaintiff Association of American Railroads (AAR) – an organization whose members include freight railroads that own tracks and facilities on and through which Amtrak's trains operate – contends that § 207 both unconstitutionally delegates rulemaking authority to a private entity and violates its members' due-process rights. Each side has now moved for summary judgment.

1

The Court concludes that the statute survives both of Plaintiff's constitutional challenges. Because the Supreme Court has held that Amtrak is to be considered a governmental entity for the purpose of constitutional individual-rights claims, Plaintiff's due-process challenge, which is premised on Amtrak's status as an interested private party, cannot prevail. The nondelegation claim, however, poses a closer question. Ultimately, though, the Court need not decide whether Amtrak should be considered a governmental entity or a private party for purposes of that issue. Even if Amtrak is a private entity, the government is sufficiently involved as to render § 207's delegation constitutional. The Court, therefore, will grant Defendants' Motion for Summary Judgment and deny Plaintiff's.

## I.      Background

By the middle of the twentieth century, the once-robust intercity passenger-train industry had fallen on hard times. Formerly the primary means of intercity travel, the railroads faced crippling competition from the burgeoning air-travel industry and the new interstate highway system. See Def.'s Mot. & Opp., Exh. 1 (Congressional Budget Office, "The Past and Future of U.S. Passenger Rail Service" (Sept. 2003)) at 5-7. In an attempt "to avert the threatened extinction of passenger trains in the United States," Lebron v. National R.R. Passenger Corp., 513 U.S. 374, 383 (1995), Congress passed the Rail Passenger Service Act of 1970, 84 Stat. 1327, 45 U.S.C. § 501 et seq. Among other things, the Act established the National Railroad Passenger Corporation, better known as Amtrak. See id. § 401(a) (codified at 45 U.S.C. §§ 561-66) (repealed and incorporated in sections of 49 U.S.C. subtit. V, part C).

Amtrak, which was set up to function as a "private, for-profit corporation," 49 U.S.C. § 24301(a), began operation in May 1971. See Nat'l R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Corp., 470 U.S. 451, 454 (1985). Then, as now, Amtrak's passenger trains ran

primarily on tracks owned by freight railroads.  See Pl.'s Mot., Decl. of Thomas Dupree, Exh. H

(AAR Comment on Proposed Metrics and Standards) at 2; Nat'l R.R. Passenger Corp. v. Boston

& Maine Corp., 503 U.S. 407, 410 (1992) ("Most of Amtrak's passenger trains run over existing

track systems owned and used by freight railroads."). To ensure the continued vitality of

passenger rail service, accordingly, Congress obligated the freight railroads to lease their tracks

and facilities to Amtrak.  See 49 U.S.C. § 24308(a).  Congress also provided that Amtrak's

intercity passenger trains would generally take "preference over freight transportation in using a

rail line, junction, or crossing."  Id. § 24308(c).  Consistent with these statutory mandates, the

freight railroads entered into contracts with Amtrak – commonly known as operating agreements

– that set out the rates Amtrak pays in exchange for use of the railroads' tracks.  See Pl.'s Mot,

Decl. of Paul LaDue, ¶ 12; Pl.'s Mot., Decl. of Virginia Beck, ¶ 13; Pl.'s Mot., Decl. of Mark

Owens, ¶ 12; Pl.'s Mot., Decl. of Peggy Harris, ¶ 12; see also Dupree Decl., Exh. G (Report of

the Inspector General, U.S. Dep't of Transp., "Amtrak Cascades and Coast Starlight Routes"

(Sept. 23, 2010)) at 29.

    Although Congress has specified that Amtrak "is not a department, agency, or

instrumentality of the United States Government," 49 U.S.C. § 24301(a), the government

remains heavily involved in its operations.  Of the nine directors who sit on Amtrak's board,

eight are directly appointed by the President, with the advice and consent of the Senate.  See 49

U.S.C. § 24302.  The ninth board member is selected by the other eight.  Id.  Amtrak is required

to submit annual reports to Congress and the President, see id. §§ 24315(a)-(b), and the

government owns more than 90% of Amtrak's stock.  See Def.'s Mot., Exh. 2 (Nat'l R.R. Pass.

Corp. and Sub., Consolidated Financial Statements for the Years Ended Sept. 30, 2011 and 2010

(Dec. 2011)) at 17-18.  Because Amtrak has never managed to become self-sufficient, moreover,

the corporation depends on substantial federal subsidies to continue its operations.  See id. at 6; Dupree Decl., Exh. Q (Katherine Shaver, "At 40, Amtrak Struggles to Stay Up to Speed," Wash. Post (May 15, 2011)) at C1.

The statute that is the subject of this suit, The Passenger Railroad Investment and Improvement Act of 2008 (PRIIA), Pub. L. No. 11-432, is the latest of several pieces of legislation intended to improve Amtrak's financial health and the quality of its service.  At issue is § 207 of that Act, which provides, in relevant part:

> [T]he Federal Railroad Administration and Amtrak shall jointly, in consultation with the Surface Transportation Board, rail carriers over whose rail lines Amtrak trains operate, States, Amtrak employees, nonprofit employee organizations representing Amtrak employees, and groups representing Amtrak passengers, as appropriate, develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations, including [, *inter alia*,] . . . on-time performance and minutes of delay . . . .

PRIIA, § 207(a) (codified at 49 U.S.C. § 24101, note).  The statute provides further details about what those Metrics and Standards should include, and it states that, "[t]o the extent practicable, Amtrak and its host rail carriers shall incorporate the metrics and standards developed under subsection (a) into their access and service agreements." Id. § 207(c).

In addition, § 213(a) of the PRIIA empowers the Surface Transportation Board (STB), "a quasi-independent three-member body within the Department of Transportation," Iowa, Chicago & Eastern R.R. Corp. v. Washington Cnty., Iowa, 384 F.3d 557, 558-59 (8th Cir. 2004), to initiate an investigation if Amtrak fails to meet the on-time performance standards laid out in the Metrics and Standards.  See PRIIA § 213(a) (codified at 49 U.S.C. § 24308(f)).  If the STB concludes that "delays or failures to achieve minimum standards . . . are attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation," as required by 49

U.S.C. § 24308(c), "the Board may award damages against the host rail carrier." Id. § 213(a).

If "appropriate," furthermore, the STB may order that those damages be remitted to Amtrak. See id.

Consistent with § 207's mandate, the FRA and Amtrak issued proposed Metrics and Standards on March 13, 2009, see Dupree Decl., Exh. B (Proposed Metrics and Standards for Intercity Passenger Rail Service (Mar. 13, 2009)), accepted comments from interested parties, see 74 Fed. Reg. 10983 (Mar. 13, 2009), and ultimately published the final version of the Metrics and Standards on May 6, 2010. See Dupree Decl., Exh. D (Final Metrics and Standards for Intercity Passenger Rail Service, Docket No. FRA-2009-0016 (May 6, 2010)). The Metrics and Standards provide that Amtrak's on-time performance is to be assessed on a route-by-route basis by reference to three separate metrics. See id. at 24-30. In general terms, these metrics address "effective speed," which is the route's distance divided by the average time it takes to traverse it, "endpoint on-time performance," which measures how often trains arrive on time at the end of the route, and "all-stations on-time performance," which measures how often trains arrive on time at each station along the route. See id. The Metrics and Standards also set limits on permissible delays, capping the delays for which a host railroad may be responsible at 900 minutes per 10,000 route miles. See id. at 27-28.

These Metrics and Standards went into effect on May 12, 2010. See id. at 1. Since then, the freight railroads have already made efforts to achieve the goals set forth therein. See LaDue Decl., ¶¶ 5-11; Beck Decl., ¶ 11; Owens Decl., ¶ 9; Harris Decl., ¶¶ 8-10. The FRA's quarterly reports have, nevertheless, consistently concluded that the Metrics and Standards are not being met on many of Amtrak's routes. See generally Dupree Decl., Exhs. M-P (FRA's February, April, July, and September 2011 Quarterly Reports); LaDue Decl., ¶ 5; Beck Decl., ¶ 8; Owens

Decl., ¶ 7; Harris Decl., ¶ 7.  While neither party has presented evidence that freight railroads have yet been fined as a result of these shortcomings, at least one petition has been filed by Amtrak against a railroad based on its alleged failure to meet the requirements of the Metrics and Standards.  See generally Pl.'s Opp. & Reply, Decl. of Porter Wilkinson, Exh. A (Petition for Relief by Amtrak, Docket No. NOR 42134).

Plaintiff in this case, the Association of American Railroads (AAR), "is a nonprofit trade association whose members include all of the Class I freight railroads (the largest freight railroads), as well as some smaller freight railroads and Amtrak." Compl., ¶ 10.  It brings this case on behalf of its Class I-member freight railroads, all of which own tracks on which Amtrak trains are operated.  See id., ¶¶ 10-11.  Because they are required to incorporate the Metrics and Standards into their operating agreements where "practicable" and because they could be subject to penalties if Amtrak's failure to live up to those standards is found to have been caused by their failure to prioritize Amtrak trains, AAR maintains that these railroads are directly harmed by § 207 of the PRIIA and the Metrics and Standards promulgated in accordance therewith.  See id., ¶¶ 11-13.  In the instant suit, AAR claims that § 207 of the PRIIA, which empowers the FRA and Amtrak to "jointly" develop Metrics and Standards, violates the constitution in two ways.  See id., ¶¶ 47-54.  Both sides now seek summary judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at

248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record."  Fed R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, Inc., 477 U.S. at 249-50.

**III.    Analysis**

This case presents two constitutional challenges to § 207 of the PRIIA. But before discussing these, the Court preliminarily notes that AAR, as a representative of the freight railroads that have operating agreements with Amtrak, has established – and Defendant has not challenged – its standing to bring them. See, e.g., Lee's Summit v. Surface Transp. Bd., 231 F.3d 39, 41 (D.C. Cir. 2000) (courts must ensure plaintiff has constitutional standing, "*sua sponte* if need be"). The freight railroads own tracks on which Amtrak trains are operated, and they are required by statute to incorporate the Metrics and Standards into their operating agreements where "practicable." PRIIA, § 207(c). If Amtrak's trains fail to achieve the goals set out in the Metrics and Standards, moreover, the freight railroads can be penalized. See id., § 213(a). Representatives of the railroads have attested that the Metrics and Standards currently affect their business operations. See LaDue Decl., ¶¶ 5-11; Beck Decl., ¶ 11; Owens Decl., ¶ 9; Harris Decl., ¶¶ 8-10. Plaintiff has shown, accordingly, that its members have been injured by the Metrics and Standards promulgated under § 207 and that such injury would be redressed by the relief it seeks. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (reciting the three elements of constitutional standing: injury, causation, and injury); Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc., 528 U.S. 167, 181 (2000) (organization has standing to bring suit on its members' behalf when members would otherwise have standing, interests at stake are related to organization's purpose, and member participation unnecessary). As there appear to be no other jurisdictional or procedural barriers to the resolution of Plaintiff's claims, the Court will proceed directly to these challenges.

AAR first contends that § 207 "violates the nondelegation doctrine and the separation of powers principle" by delegating legislative power to Amtrak, a private entity. See Compl., ¶ 51. Second, it argues that § 207 violates the Due Process Clause of the Fifth Amendment by

"empower[ing] Amtrak," an "interested private part[y]," "to wield legislative and rulemaking power to enhance its commercial position at the expense of other industry participants." Id., ¶¶ 53-54.  Although these claims are brought under two different provisions of the Constitution, both involve the same alleged flaw in the statute: the delegation of rulemaking authority to Amtrak.  Both, furthermore, are premised upon Amtrak's status as a private entity.  Whether Amtrak, a federally chartered corporation, should in fact be considered a private entity for purposes of Plaintiff's constitutional claims is thus the necessary jumping-off point.

Because the answer to that question is clearer (and, indeed, decisive) with respect to the due-process claim, the Court will begin there.  Concluding that Amtrak is a governmental entity for purposes of constitutional individual-rights claims and that AAR's due-process claim falls neatly within that category, the Court will on that ground grant Defendants' Motion with respect to that issue.  Turning to the nondelegation claim, though, Amtrak's status as a governmental or private entity is less clear.  Fortunately, however, the Court need not resolve that question.  Instead, it finds that, even if Amtrak is a private entity, § 207's delegation survives AAR's nondelegation challenge because the government retains control over the promulgation of the Metrics and Standards.  The Court will thus grant Defendants' Motion with respect to that claim as well.

A. Due Process Claim

The Fifth Amendment's Due Process Clause prohibits interested private parties from wielding regulatory authority.  See Carter Coal, 298 U.S. at 311 (holding that "the power to regulate the business of another, and especially of a competitor," is "a denial of rights safeguarded by the due process clause"); Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 805 (1987) ("potential for private interest to influence the discharge of public duty"

violates due process); <u>Gibson v. Berryhill</u>, 411 U.S. 564, 578-79 (1973) (due process violated when governmental authority exercised by parties with "substantial pecuniary interest in legal proceedings").  Amtrak, AAR argues, is a private entity that competes for commercial position with the freight railroads.  Because PRIIA endows Amtrak with rulemaking authority, AAR maintains that the statute contaminates the regulatory process with the potential for bias and, accordingly, violates its members' due-process rights.

AAR's contention that § 207 violates its members' due-process rights thus assumes that Amtrak is a private entity.  <u>See</u> Compl., ¶¶ 53-54.  In light of Congress's clear statement that Amtrak "shall be operated and managed as a for-profit corporation" and "is not a department, agency, or instrumentality of the United States Government," 49 U.S.C. § 24301(a)(3), that assumption is certainly not baseless.  Indeed, the D.C. Circuit has previously held that "Amtrak is not the Government" in the context of a False Claims Act claim.  <u>See United States <i>ex rel.</i> Totten v. Bombardier Corp.</u>, 380 F.3d 488, 490 (D.C. Cir. 2004).

In <u>Lebron v. National Railroad Passenger Corporation</u>, 513 U.S. 374 (1995), however, the Supreme Court addressed Amtrak's status as a governmental or private entity in the context of a First Amendment claim.  The Court stated that Congress's statements that Amtrak is not the government are "assuredly dispositive of Amtrak's status . . . for purposes of matters that are within Congress's control – for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the Administrative Procedure Act."  <u>Id.</u> at 392 (citing 45 U.S.C. § 541 (repealed, revised, and incorporated at 49 U.S.C. § 24301(a))).  For purposes of matters that are outside of Congress's control, however, the Court emphasized that "it is not for Congress to make the final determination of Amtrak's status as a Government entity . . . ."  <u>Id.</u>  "If Amtrak is, by its very nature, what the Constitution regards as the

Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment." Id. "It surely cannot be," the Court stressed, "that government . . . is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." Id. at 396.

The Court, therefore, undertook a functional analysis to determine whether Amtrak should be considered a governmental entity in the context of the constitutional claim presented in that case. See id. at 393-400. Noting that Amtrak "was created . . . explicitly for the furtherance of federal governmental goals" and that "six of the corporation's eight externally named directors . . . are appointed directly by the President," id. at 397-98, the Court found that the government exercises permanent control over Amtrak not merely "as a creditor[,] but as a policy maker." Id. at 399. It held, accordingly, that Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." Id. at 394.

This discussion in Lebron plainly dictates the outcome of AAR's due-process claim, which falls squarely in the category of constitutional individual-rights claims. See, e.g., J. MacIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2786 (2011) ("The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power.") (plurality opinion). The two hallmarks of government control that the Lebron Court found decisive – namely, that Amtrak was created by special law for the furtherance of governmental objectives and that the government retained the authority to appoint a majority of directors – moreover, have not changed. Indeed, when Lebron was decided, the President appointed only six of Amtrak's nine directors, see Lebron, 513 U.S. at 397; he now appoints

eight of the nine.  See 49 U.S.C. § 24302(a).  The government, moreover, retains more than 90%

of Amtrak's stock, see Consolidated Financial Statements at 17-18, appropriates for Amtrak

more than a billion dollars annually, see PRIIA, § 101, and sets salary limits for Amtrak's

employees.  See 49 U.S.C. § 24303(b).  In addition, Amtrak is required to submit annual reports

to Congress and the President.  See id. §§ 24315(a)-(b); cf. Rocap v. Indiek, 539 F.2d 174, 180

n.12 (D.C. Cir. 1976) (considering need to report to Congress as an indicator of federal control

for purpose of determining FDIC's governmental status under a federal statute).

     AAR's attempts to distinguish Lebron fall short of their mark.  Plaintiff, for example,

stresses that Congress removed Amtrak from the list of mixed-ownership government

corporations after Lebron was decided.  See Pl.'s Mot. at 27-28 (citing Pub. L. No. 105-134, §

415(2)).  The inference it would have the Court draw, it seems, is that this changed circumstance

should affect the outcome.  The Supreme Court, however, clearly stated that Congress's *ipse

dixit* cannot change Amtrak's nature for purposes of constitutional individual-rights claims.  See

Lebron, 513 U.S. at 392, 396.  Just as Congress's plain statement that Amtrak should be regarded

as a private corporation does not make it such in the eyes of the Constitution, see id. at 392, its

removal of Amtrak's name from a list of mixed-ownership corporations, *a fortiori*, similarly

does not alter its nature.  It was the still-unchanged facts that Amtrak was created "by special law

. . . for the furtherance of governmental objectives" and that the government "retains for itself

permanent authority to appoint a majority of [its] directors" – not the presence of Amtrak's name

on a statutory list – moreover, that were decisive in Lebron.  See id. at 400.  And while AAR is

correct that Amtrak has some private shareholders, that was the case at the time Lebron was

decided and did not alter its analysis.

In addition, even if Plaintiff is right that Amtrak is a private entity <u>for purposes of PRIIA</u>, which it argues was intended "to boost the bottom-line of a for-profit corporation," Pl.'s Mot. at 28, that does not change its status <u>for purposes of the Constitution</u>. <u>See</u> <u>Lebron</u>, 513 U.S. at 392 (concluding that Congress can determine Amtrak's status for the purpose of "matters that are within Congress's control," like other federal statutes, but not for matters outside its control, like the Constitution); <u>see also</u> <u>Totten</u>, 380 F.3d at 492 (concluding Amtrak is the government for purposes of the False Claims Act because "False Claims Act coverage is . . . a matter within Congress's control"). Again, Congress can only determine Amtrak's status for the purpose of issues it has the power to control. <u>See</u> <u>Lebron</u>, 513 U.S. at 392. Because AAR contends that PRIIA violates the <u>Constitution</u> – not that Amtrak or any other entity violated PRIIA – it is, of course, Amtrak's status for purposes of constitutional individual-rights claims, not PRIIA claims, that controls.

As Plaintiff emphasizes, furthermore, "[T]he <u>Lebron</u> Court explained that while Amtrak is part of the Government for purposes of the constitutional <u>obligations</u> of Government – such as the obligation to respect an artist's First Amendment rights – Amtrak is <u>not</u> part of the Government for purposes of the inherent <u>powers and privileges</u> of the Government." Pl.'s Opp. & Reply at 8 (emphases in original). AAR's due-process challenge plainly belongs in the former camp. Just as the Government is obligated to respect individuals' First Amendment rights, <u>see</u> <u>Lebron</u>, 513 U.S. at 399, so too is it constitutionally required to respect their due-process rights. Consistent with the standard Plaintiff itself enumerates, then, Amtrak is a governmental entity in the context of this claim. <u>See</u> <u>id.</u> (holding that Amtrak "is an agency of the Government . . . for purposes of the constitutional obligations of Government").

Perhaps recognizing that <u>Lebron</u> poses an insurmountable barrier to its argument that Amtrak is a private entity for purposes of its due-process claim, AAR attempts to raise two alternative arguments in its Opposition and Reply. <u>See</u> Pl.'s Opp. & Reply at 15-17. First, it contends that § 207 violates its members' due-process rights even if Amtrak is a governmental entity. <u>See id.</u> at 15-16. Amtrak's pecuniary incentives, it argues, are so significant as to constitute a due-process violation even if Amtrak is not a private party. <u>See id.</u> (distinguishing, <em>e.g.</em>, <u>Marshall v. Jerrico</u>, 446 U.S. 238 (1980), which held that an agency's having a "remote" financial interest in proceedings did not violate due process, <u>id.</u> at 243-52). Second, AAR suggests that finding Amtrak to be a governmental entity renders its structure unconstitutional under the Appointments Clause. <u>See id.</u> at 16-17.

Neither argument, however, was raised in AAR's initial brief, and both are outside the scope of its Complaint, which premises its due-process claim on Amtrak's status as a private entity. <u>See</u> Compl., ¶¶ 53-54. Especially given that these arguments are raised only cursorily and that one is a new constitutional claim, the Court declines to address them. <u>See, e.g.</u>, <u>Jo v. Dist. of Columbia</u>, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment."); <u>Quick v. U.S. Dep't of Commerce</u>, 775 F. Supp. 2d 174, 183 (D.D.C. 2011). In passing, however, the Court notes that, in light of the FRA's and STB's involvement and Amtrak's political accountability, <u>see</u> Section III.B., <em>infra</em>, the potential for bias appears remote, and the scheme, accordingly, would likely pass muster under the Due Process Clause. <u>See</u> <u>Marshall</u>, 446 U.S. at 243. Concluding that Amtrak is to be considered part of the government for purposes of Plaintiff's due-process claim, furthermore, does not necessarily implicate the Appointments Clause issues AAR highlights, which seem to relate more to the

nondelegation challenge than the due-process claim.  In any event, the Court here goes no further than Lebron's clear holding that Amtrak is the government in the context of claims that invoke the Constitution's guarantees of individual rights.

In the end, because Amtrak is a governmental entity for purposes of Plaintiff's due-process challenge, the Court will grant Defendants' Motion and deny Plaintiff's with respect to that claim.

B.  Nondelegation Claim

Plaintiff's next challenge asserts that Congress unconstitutionally delegated lawmaking authority to Amtrak, a non-governmental entity, when it gave Amtrak joint responsibility for issuing the Metrics and Standards.  This claim thus also takes as its premise that Amtrak is a private entity.  See Compl., ¶¶ 48-49.  Whether Lebron dictates Amtrak's status for purposes of this claim, though, is less clear.  On the one hand, the structural constitutional principles from which AAR's nondelegation claim derives are distinct – both legally and logically – from the document's guarantees of individual rights.  Lebron, in fact, approached the question of Amtrak's status with the assumption that its answer could be different with respect to different kinds of claims.  Its explicit holding that Amtrak is the government "for the purpose of individual rights guaranteed against the Government by the Constitution," Lebron, 513 U.S. at 394, fairly implies that Amtrak's status might be different in the context of other kinds of constitutional claims – perhaps especially those invoking structural principles in an attempt to limit Congress's ability to utilize private forms.

On the other hand, it is possible to conceive of the nondelegation doctrine, especially when invoked by private parties, as a guarantor of individual rights.  See, e.g., Bond, 131 S.Ct. at 2365 ("The structural principles secured by the separation of powers protect the individual as

well [as the branches of government].").  Looked at this way, AAR's nondelegation claim might

fall into the category of individual-rights claims for purposes of which <u>Lebron</u> held Amtrak to be

a governmental entity.  Indeed, given the similarity of AAR's two claims, it would seem strange

to consider Amtrak the government for purposes of due process but a private entity for purposes

of nondelegation.  Alternatively, <u>Lebron</u> can be read as holding that Amtrak should be

considered part of the government for purposes of <u>any</u> constitutional claim.  If the Court's logic

was that Congress can designate an entity's status for the purpose of things it can control (like

other statutes), but cannot change its nature for the purpose of things it cannot control (like the

Constitution), <u>Lebron</u>'s conclusion that Amtrak "is, by its very nature, what the Constitution

regards as the Government," <u>id.</u> at 392, would appear to apply equally to a nondelegation claim.

 The Court, however, need not decide Amtrak's status in the context of AAR's

nondelegation challenge.  Even if Amtrak is a private entity, as Plaintiff contends, the

government retains ultimate control over the promulgation of the Metrics and Standards.  Section

207's delegation, accordingly, passes constitutional muster.

 Article I of the Constitution provides that "All legislative Powers . . . shall be vested in a

Congress of the United States."  Art. I, § 1, cl. 1.  The Supreme Court, nevertheless, has long

interpreted the Constitution to permit Congress to delegate legislative power to executive

agencies within certain constraints.  <u>See, e.g.</u>, <u>Wayman v. Southard</u>, 23 U.S. (10 Wheat.) 1, 41

(1825); <u>Sunshine Anthracite Coal Co. v. Adkins</u>, 310 U.S. 381, 398 (1940) ("Delegation by

Congress has long been recognized as necessary in order that the exertion of legislative power

does not become a futility."); <u>Mistretta v. United States</u>, 488 U.S. 361, 372 (1989).  Courts have

also upheld delegations of rulemaking authority to nongovernmental entities, but such

delegations are subject to more significant strictures.  <u>See</u> <u>Sunshine Anthracite</u>, 310 U.S. at 388,

399; <u>Pittston Co. v. United States</u>, 368 F.3d 385, 394 (4th Cir. 2004); <u>United States v. Frame</u>, 885 F.2d 1119, 1128-29 (3d Cir. 1989) (abrogated on other grounds).  A delegation to a private party without sufficient government oversight, the Supreme Court has held, is "legislative delegation in its most obnoxious form."  <u>Carter Coal</u>, 298 U.S. at 311.

A series of cases in the Supreme Court and the Courts of Appeals has partially illuminated the limits of delegations to private entities.  In <u>Sunshine Anthracite</u>, for example, the Court upheld a statutory scheme that permitted groups of coal producers to set prices for coal on the ground that those prices would become effective only when approved by the National Bituminous Coal Commission, a government agency.  <u>See</u> 310 U.S. at 388, 399.  In concluding that the delegation was constitutional, the Court emphasized that the private parties "function[ed] subordinately" to the government.  <u>Id.</u> at 399.  In <u>Pittston</u>, the Fourth Circuit rejected a challenge to a statute that permitted a private entity to decide whether to refer coal companies to the Secretary of Treasury for an enforcement action.  <u>See</u> 368 F.3d at 397.  Because the private entity's role was merely "advisory" and the Secretary made the ultimate decision as to whether a penalty would be imposed, the court found that the statute complied with constitutional separation-of-powers principles.  <u>See id.</u>  Finally, in <u>Frame</u>, a private group of cattle ranchers and importers collected assessments from others in the cattle industry and took "the initiative in planning how those funds [would] be spent."  885 F.2d at 1123, 1128.  Because "the amount of government oversight . . . [was] considerable," however, the Third Circuit upheld the statutory provision.  <u>See id.</u> at 1128-29.

These cases – upon which both parties rely – confirm that Congress cannot delegate to a private party absolute power to enact regulations that will carry the force of law.  <u>See also</u> <u>Carter Coal</u>, 298 U.S. at 311.  A private party may play a role in the rulemaking process, but the

Constitution requires that the government retain ultimate control.  Section 207 passes this test.

Not only is the FRA co-author of the Metrics and Standards – and, as a result, Amtrak could not

have promulgated them without the FRA's approval – but the STB also retains control over their

enforcement.  And even if the involvement of these agencies is not enough to ensure the

constitutionality of § 207's delegation, the government retains structural control over Amtrak

itself.  Taken together, the FRA's and STB's roles and the government's control over Amtrak

render the statutory scheme constitutional.

Section 207 of the PRIIA provides that the FRA and Amtrak shall "jointly" develop the

Metrics and Standards.  While the AAR is correct that this scheme in a sense makes Amtrak the

FRA's equal – as opposed to its subordinate – Amtrak cannot promulgate the Metrics and

Standards without the agency's approval.  In an important sense, this renders the delegation

effected by § 207 similar to that upheld in Sunshine Anthracite.  There, the Court held that a

delegation was constitutional because the prices set by the private entity would not be effective

unless the government acted to adopt them.  See Sunshine Anthracite, 310 U.S. at 388, 399.

Although the use of language ("jointly") that appears to endow the governmental entity and the

private party with equal responsibility for the promulgation of rules makes this scheme appear to

constitute a more significant delegation than that upheld in Sunshine Anthracite, that is not

necessarily so.  In one case, the government acts as a rubber stamp to approve regulations

proposed by a private entity; in the other, the government serves as a coauthor of the regulations

and, absent a circumstance not present here, must approve them before they have the effect of

law.  Why is the latter (the scheme at issue here) a more problematic delegation than the former

(Sunshine Anthracite's statutory scheme)?

Of course, as AAR repeatedly emphasizes, the co-equal roles played by Amtrak and the FRA also entails that the FRA could not enact the Metrics and Standards without <u>Amtrak</u>'s approval. Conditioning regulation on a private party's assent, however, is not constitutionally problematic. <u>See, e.g.</u>, <u>Currin v. Wallace</u>, 306 U.S. 1, 15 (1939) (upholding a statute that provided agency could not take particular action unless two-thirds of industry participants favored it). Indeed, the Supreme Court has reasoned that through such schemes the government "merely place[s] a restriction upon its own" ability to regulate. <u>Id.</u>; <u>see also</u> <u>United States v. Rock Royal Cooperative</u>, 307 U.S. 533, 577 (1939) ("requirement of [private party's] approval would not be an invalid delegation"); <u>Frame</u>, 885 F.2d at 1127-28.

Looking at the bigger picture, moreover, just as the FRA remains involved with the Metrics and Standards' promulgation, the STB is the entity ultimately responsible for their enforcement. While AAR's challenge is to the delegation of rulemaking authority – not the delegation of enforcement authority – its papers repeatedly reference the Metrics and Standards' enforcement and penalties scheme and question the fundamental fairness of Amtrak's role therein. That the STB retains control over the enforcement mechanisms, accordingly, merits mention. True, Amtrak has the power to initiate an investigation by the STB where its on-time performance falls below 80%. <u>See</u> 49 U.S.C. § 24308(f)(1). As in <u>Pittston</u>, however, it is the governmental entity (here, the STB) that performs the investigation and may ultimately impose penalties. <u>See</u> <u>Pittston</u>, 368 F.3d at 397. Merely granting a private party the power of referral – a power, as it happens, that the freight railroads also possess, <u>see</u> 49 U.S.C. § 24308(f)(1) – does not pose a constitutional problem. <u>See</u> <u>Pittston</u>, 368 F.3d at 397.

All that said, Plaintiff may ultimately be correct that Amtrak plays a larger role in the promulgation of rules under § 207 than the private entities did in the cases on which Defendants

rely.  Under § 207, the FRA retains equal responsibility for the promulgation of the Metrics and

Standards and the STB, not Amtrak, has the ultimate power to enforce them.  But, the

involvement of the FRA and the STB notwithstanding, the statute's choice of the word "jointly"

undoubtedly makes it difficult to characterize Amtrak's role as "subordinate[ ]," Sunshine

Anthracite, 310 U.S. at 399, or merely "advisory."  Pittiston, 368 F.3d at 398; Frame, 885 F.2d at

1129.  If the FRA and STB's involvement were the sum total of the government's control,

accordingly, this may have been a more difficult question.

That, however, that is not the case.  While the Court assumed for purposes of this

discussion that Amtrak is technically a private entity, that does not mean it assumes away the

facts on the ground.  The Court hardly need reiterate the indicia of the government's control over

Amtrak that it discussed in Section III.A, *supra*, but, in brief: Amtrak was created by special law

for the furtherance of governmental objectives, and the government sets its goals; the President

appoints eight of the nine directors; Amtrak is required to submit annual reports to Congress and

the President; the government owns more than 90% of Amtrak's stock; Amtrak relies on more

than a billion dollars in congressional appropriations annually; and Congress sets salary limits

for Amtrak's employees.  While Congress has declared that Amtrak is to be operated as a "for-

profit corporation" and should not be considered "a department, agency, or instrumentality of the

United States Government," 49 U.S.C. § 24301(a), the government clearly retains control of the

organization.  Cf. Frame, 885 F.2d at 1128-29 (considering government's structural controls over

the private entity as relevant to nondelegation claim); see also Lebron, 513 U.S. at 397-400.

Taken together, the involvement of the FRA in promulgating the regulations, the role of

the STB in their enforcement, and the government's structural control over Amtrak itself more

than suffice.  That an entity that shares some characteristics with private corporations is involved

in the rulemaking process does not offend the separation-of-powers principle. In the end, § 207

establishes a scheme in which government entities retain control over an entity that, even if

technically private, is itself controlled by the government.  The Constitution requires no more.

**IV.    Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order granting

Plaintiffs' Motion for Summary Judgment and denying Defendant's.


                                          */s/ James E. Boasberg*
                                          JAMES E. BOASBERG
                                          United States District Judge

Date:  May 31, 2012